Good morning. May it please the Court. We are here before the Court on this appeal as a result of the trial court's mismanagement, both of the pretrial and trial process. Specifically, as a result of a summa sponte summary judgment order that was entered on the morning of trial during pretrial conference, minutes before Bois d'Ire was supposed to begin. And then also as a result of specific instructions, not only comments, but specific instructions that the district court gave to the jury that were improper and went beyond the bounds of appropriate commentary from a judge in a trial court setting. Those two areas of wrongdoing created an environment that produced an unfair trial process and significant prejudice for clients. The only remedy that will cure that prejudice is to reverse and remand for a new trial. The summary judgment order is perhaps the biggest issue with respect to this appeal and how the trial proceeded. It permeates the entire trial process. The parties, of course, have been fully briefed for months. The Court ruled on it in August of 2024. Based on a perceived vagary within the Court's order and the failure to address a specific affirmative defense that went to the liability of our clients with respect to a breach of contract claim, the foundation parties moved to reconsider and moved to clarify. Because if the, it appeared that potentially the Court was taking away one of the fundamental core arguments in defense at trial, the excuse of performance defense. The summary judgment order only referred to a set-off defense, which was pled in the alternative. As to the specific performance, I mean, the excuse of performance defense, it was completely silent. We moved to reconsider and for clarity specifically so that we could have appropriate time to develop a trial strategy. It was never our intent to go into trial blind or on a whim. As your Honors know, it's a very deliberate thought-out process on how you're going to approach a case and you build your case all throughout discovery based on how you pled and with respect to your affirmative defenses. And then, so when we got the motion for reconsideration order back, the Court said, and I quote, whether the foundation parties were excused from their payment obligations is a question that is essentially related to damages. The Court limited its grant of summary judgment to the undisputed fact that foundation parties failed to pay under the First Amendment to the Asset Purchase Agreement. Whether and to what extent the foundation parties must pay, however, are fact questions preserved in the order. We approached the trial process with those assurances as to the fact issue being preserved for the jury. And what the summary judgment order did was it removed that defense from our trial strategy and caused us to have to immediately react on the fly the morning of trial to alter. Do you move for a continuance? Your Honor, we moved actually for a permission to file an interlocutory appeal. That was the first few paragraphs of the pre-trial appeal. I believe it's on pages 21, lines 13 through 23. We recognized the issue and said, this is very significant. I told the trial court, this is a significant issue and it's going to materially impact how we approach the case. We'd like to have a couple minutes with our clients to determine whether or not an interlocutory appeal would be something we want to formally request. And then we did request it. The Court denied it and said, the jury's here. It's time to proceed. We're going to proceed. How long before the trial was the motion to reconsider or to clarify file? That was filed, Your Honor, on August 30th. I said, how long before the trial? I apologize, Your Honor. It was two months. So August 30th, the trial started on October 28th. The District Court of the Trial Court issued its ruling on that on September 5th. So we had seven weeks, essentially, with which nothing happened. Nothing materially changed. The analysis didn't change. Is it fair to say that the District Court kind of viewed the offset damages as the same issue as the excused performance? Am I reading that right? And can you articulate for me then why that was incorrect and what the prejudice was? Because they're certainly related concepts. You would agree with that, right? I agree. They are related concepts. They both, but they're as a different element of the contract claim. And it's something I addressed directly to Judge Traynor. He said, isn't this just set off? I said, no, Your Honor, it's not. It's different. Set off would be, I have damages, you have damages, and then it offsets in some ways. The excuse of performance defense, at least that we presented it, was a liability defense. It goes to the party's conduct. What is it that happened the morning of the trial? You just made it sound like he didn't rule on these motions until the morning of the trial. Then you just said, no, he ruled about seven weeks before the trial and then nothing happened. So what's the surprise point? The surprise was that the court entered full summary judgment as to their contract claim. They moved affirmatively for summary judgment. That happened in August. The court made a finding as far as that there had not been payment. And then he fashioned it as that there had been a breach. But the court did not fully enter judgment as a matter of law on the claim. He left that kind of hanging. So that's when we moved to reconsider and asked the court for clarification. And that's when the court issued this clarification specifically saying whether and to what extent the foundation parties must pay, however, fact questions, preserved in order. I read that to mean the excuse of performance defense is live. He said that whether or not he's going to give an instruction on the excuse of performance was something that he would be determined based on what evidence comes in, which is, of course, part of the trial process. But the whether is the key word there because that goes to the heart of the excuse of performance defense, which is you breached before I did. I don't have to continue performing because your breach was material and therefore I'm excused from continuing. And the performance obligation that we were focusing on was specifically the obligation to pay an earnout amount, which was tied into the goodwill amount with respect to this particular asset. You say tied into. The earnout was tied into what specifically in the agreement? The earnout was tied into the amount of goodwill, the price point that our clients were paying for the goodwill for the dealerships. But at closing, only $14 million of the total $17 million of goodwill was paid. The rest was going to be paid through an earnout, which was based solely on the dealership's performance after closing. So it's tied to essentially it's the dealership's performance. You're saying that the goodwill that was conveyed to your clients was less than it should have been? Is that the inventory? That's the inventory. Yeah, those are the inventory claims. So that was directly... Why isn't that just, like Judge Treanor said, a damages issue? I mean, we're talking about how much... It seems similar to damages. Why isn't that the case? And that you got to try as I understood it. Yes. I think it's similar to damages. And I think it's similar to damages because of how it came out in this case. So it was a post-closing performance that we were able to see that a certain amount of the goodwill was being held back. So the substantial majority of the goodwill had been paid, but the obligation to continue to pay or to perform fully under the earnout provision was also subject to certain conditions precedent, including maintaining the inventory levels, which at that point in time, at the closing, they were flying blind on. They didn't have an understanding with respect to the inventory numbers and whether or not they hit the 12-month rolling average, which was an issue, a big issue in the case. That didn't come out until later as the case developed. Why doesn't the jury verdict moot this out? I mean, obviously, you don't think it does. Is there something about you not being able to present the theory as you wanted it that's prejudicial here? With respect to the specific performance? Well, the failure of consideration. I mean, the jury found there was no breach by the other party, right? Correct. I mean, and as I take it, the argument you were just making is the inventory was lower than it should have been. Arguably, the jury said, we disagree with that. Why doesn't that moot out this argument, however it was presented below? The jury made a finding that there was no breach. In other words, that the goodwill was as it was represented under the contract. Why doesn't that resolve this issue? I think that bleeds into kind of the second category of conduct that we were focusing in on, on the appeal. I think it's hard to say with certainty, you know, of what impacted the jury. But when the district court judge keyed in on very specific documents that dealt with inventory, I'm sure your honors have seen references to the CDK documents that are in the record. There's a question that was presented at trial as to whether or not our clients had access to the inventory numbers prior to closing. The argument on the Cooper party side was, well, look at the CDK document. You know, it says they had access. You know, I signed it on this date. It was months before the closing. They could have gone and looked at the inventory. And our client, Mr. Slemko, was on the stand and I elicited testimony from him that said, I've never gotten access to inventory information prior to closing. We've never gotten that CDK stuff. I've been to 30 different closings. It just doesn't happen. And I got him on the record saying we didn't get access early in this case either. And then Judge Treanor came in and asked a series of questions in my redirect examination about the CDK documents. And ultimately, he turned to the jury and said, I'm instructing you to disregard all of his testimony, essentially, on the CDK documents. They don't know whether or not they could have accessed the information before that. That is a key issue with respect to our inventory claim. Because with that instruction, essentially, the court is opening the door for the possibility of whether or not there had been testimony at that point. Was that objected to? I'm trying to remember. Or are we on plain error here? I raised the issue in a mistrial motion later on in Phase 4. That's plain error. It was our position we preserved it. But I think, regardless of the scrutiny, I think even under plain error standard, that would constitute plain error. And I think a new trial would be warranted on that. Let's go back to the excuse of performance that you wanted to assert. Yes, Your Honor. As I understand the law, you can assert that where the proposed breach basically defeats the object of the agreement. And your proposed breach was this inventory issue.  Does that defeat the object of the contract? The inventory shortcomings? Yes. I think it had severely impaired the value of the dealerships, which was all right. That may be. But the dealerships were still transferred. I mean, it seems to me that's a relatively minor breach and doesn't defeat the entire object of the contract. And therefore, you really didn't have an excuse of performance defense. Tell me what I'm missing. And I guess it comes down to it's a very factual argument at trial. But the testimony that came out was that inventory is the lifeblood of every dealership that's out there. And that keeping and maintaining those inventory numbers was necessary because that's how it generates revenue. And if you're declining inventory, the way that the inventory process works is you have to sell cars to get offered more inventory as a result. And that if you don't keep your pipeline full of inventory, it is very difficult to get back on equal footing and then get back to your allocation rate as you previously had it. It was in our mind was the important, the critical issue with respect to valuing the dealerships. And it was based on inventory numbers and the historical performance. So when it starts to decline, you're getting a dealership that is not as valuable as you had gotten from all the projections. But that's a damages question, isn't it? Which is what Judge Traynor allowed to go to the  The failure to maintain the inventory was a liability issue. Well, but you just said that that means the dealership is less valuable. Yes. And you were allowed to go into that at trial, right? I mean, that's essentially the way the district court framed the case, a question of damages. Yes, Your Honor. I agree with that. And it did go, we did go to trial. But there were other setbacks with respect to how the judge handled our evidence. And I think that that goes into Ms. Knutson's testimony, who is our expert. I think essentially I made a reference on the record that there was a, that what I was arguing with respect to our renewed Aubert motion was really arguing against directed verdict before we'd even been fully heard on our case. He, Judge Traynor, essentially prohibited us from offering any evidence as to Subaru lost sales, which is the other dealership other than Chevrolet, before Ms. Knutson was even allowed to take the stand and testify. And instructed the jury, you cannot consider anything with respect to Subaru before we were even fully heard on our issues and the rest of our case. So on your point about the judge questioning the witness, was it this judge's practice to question witnesses throughout the trial or was this an isolated situation? If I have it correctly, Your Honor, the only two witnesses that received questions from Judge Traynor were our expert and then Mr. Slemko. So it was, I wouldn't call it a normal practice through trial. Like every witness that took the stand, he had a couple of questions for him. It was only as to Mr. Slemko and Ms. Knutson. What did he ask the expert? He asked the expert, these dealerships were being operated on one financial sheet. And when we got the inventory analysis, the inventory documents for our expert to analyze, both dealerships were operating off of one sheet. And so it could not be separated. So she did an analysis based on the combined statements and the court said, you have to separate them out because I'm not going to allow you to do the Subaru stuff. And so that was really what he was driving in on the point that nothing had come in the Subaru. Okay. Thank you. Would you care to reserve for a moment? I'll reserve the last two minutes of my time for rebuttal. Thank you. You may. Thank you. Mr. Bakke, we'll hear from you. You may adjust that downward if you wish or adjust the microphone. Thank you. So we can hear you well. Very well. You may proceed. Good morning, Chief Judge and judges of the Eighth Circuit Court of Appeals. I'm Randy Bakke. I represent the Defendant Appellee Babko and Robert Cooper in this matter. We're requesting this court to affirm the jury verdict after a seven-day jury trial and also the court did correctly grant summary judgment on the earn-out issue. And let me tell you what Mr. Schaffer left out of his discussion in that regard. When we filed our summary judgment motion, the complete earn-out time period had not yet expired. It was a four-year earn-out period with four separate years to be paid at $750,000 each year, assuming a threshold of $2.5 million was reached in essentially net income, EBT they call it in the accounting world. And when we filed our summary judgment motion, only three out of the four years had been met because the next year had not yet expired. So when Judge Traynor issued his order, he indicated they had not paid, but the damages were still uncertain. By the time we got to trial, and this was raised in the pretrial briefs, all four years of the threshold had been met by that time. And so our understanding was that we would then tell the jury that the earn-out monies were due and it came up in the briefing on this matter. And I'll tell you specifically what foundations said in their pretrial brief about nine days before the start of the jury trial. And I'm at App 149. Foundations said, quote, the parties agreed that the requisite earnings before tax, EBT, thresholds in the APA were met to trigger the earn-out payments and that the foundations have not made earn-out payments to BAPCO. That's what they told the court in their pretrial brief is none of the earn-out payments for the $3 million was due. So we asked the court at the start of it, Judge, can we tell the jury that and can we tell the court that summary judgment was granted in that regard? And so they were trying to preserve an excuse of performance argument to the jury at that point, right? And did Judge Traynor address that specifically? He did. Contrary to what has been said, there was an excuse of performance jury instruction provided, which was F14 by Judge Traynor, which correctly stated what the North Dakota law is on excuse of performance. They did not get the jury instruction they wanted. And I'll tell you what Mr. Schaefer said at the pretrial conference when this earn-out issue came up as to what their theory was for excuse of performance. And I'm quoting Mr. Schaefer on App 331. App what? That there was not a breach because of the first material breach by BAPCO Inc. That there was no obligation to continue performance. And so there cannot be a breach if there is an excuse. So that's our position in a nutshell, end quote. So their position was that they were excused from any performance under the contract if any little thing was breached by my client, which at that point they had not proven any breach. And as it turned out, they were fully allowed to try their inventory claim, their breach of confidentiality claim and their other claims, some of which were dismissed on directed verdict. And they really didn't fight them, such as a solicitation claim, because they conceded they didn't present any evidence on solicitation of their employees by my client. Are you saying that the excuse of performance defense was presented to the jury? It was. That doesn't make much sense to me if there's already been a summary judgment on the, because the thing to be performed that they wanted excused was the earn-out. And if the earn-out already has a summary judgment against it, what would be excused? That's a very good question. But they got the excuse of performance jury instruction. It wasn't precisely what they requested. In North Dakota, and it's a matter of decision by the North Dakota Supreme Court, there are two circumstances under which you can have excuse of performance. First is failure to substantially perform the obligations under the contract. And second is when you prevent the other party from performing. That's the PEGB CON, K-O-H-N, North Dakota Supreme Court case and the Monarch photo cases. And they were not claiming that my client prevented them from performing the contract. That wasn't that issue. I think what they were arguing or should have argued was there was not substantial performance. So that's the jury instruction that Judge Traynor gave to the jury on excuse of performance, which was if Mr. Cooper, BAPCO, did not substantially perform the contract obligations, the essential purpose of the contract is the words in the jury instruction, then he has breached the contract. Well, that was not proven. And this issue of inventory was substantially disputed by the parties. And this issue of CDK, which bleeds into the issue of Mr. Slemko, it's not correct that Mr. Slemko was not allowed to testify as to CDK at all, as they're asserting. He was, in fact, allowed to fully testify. The only questioning by Judge Traynor related to him saying that Foundation never gets the CDK information before the closing. And the CDK information from GM is what dealers will tell you is the lifeblood of the dealership. It contains all the information, all their prior customers, all their vehicles and inventory, all their sales, what money they make on the service side of the business, everything, all their accounting and everything. And at 1695 is the CDK information. And the reason this came up is the closing on this dealership sale was on June 21, 2019. On May 14, 2019, about five, six weeks before, Mr. Cooper signed an authorization allowing them to get the complete CDK information for both the Subaru dealership and the Chevrolet dealership in advance. In other words, he had no money change hands. He was giving them all the information he had about his dealerships and his customers and everything else to try to get this deal to go through because they had postponed it. Foundation had three times. And that's the context in which Judge Traynor asked Mr. Slemko the question, did you have the specific CDK information? And that was the question he was not answering. Mr. Slemko was a very hostile witness. He would not answer the questions and he took it on himself to speed up the trial to just ask him, did you have it? Did they? Did Foundation have it? And his answer was, no, we did not. Why couldn't you ask him that? Pardon? Why couldn't you ask him that? Because I had already cross-examined him and my opportunity was gone. Why should the judge supplement your cross-examination? Because he was suggesting to the jury falsely that they couldn't access that information by saying they never had access to CDK information on any of their prior 20-plus closings. Isn't that your job then to recognize that as opposed to misrepresent? Let me finish my question. Isn't it your job then to rectify that supposed misstatement by the witness? I suppose it could have been, but he was just, the judge I think was just trying to get a clarified answer as to whether in this case they had that information available and it was not available to them in this case. He finally conceded that. Now, in relation to Mr. Slemko, they did not object to that question by the judge in any way. I noticed in their reply brief they say that, well, we didn't have an opportunity because we called our next witness, Mr. Chris Schneider, right away. They could have asked for a sidebar. They could have asked to meet out of the hearing of the jury. They didn't do that. Mr. Schneider was a very short witness. He was not their last witness. They could have after that made a record to the judge. And so they've waived any objection to any question by the judge of Mr. Slemko. Mr. Shea, could I go back to the jury instructions just for a minute? You said there was an excuse of performance instruction, F14, but as I read that, that just tells the jury two circumstances in which a party is not excused. It doesn't offer that as an option for the jury to rule in favor of the other side. Well, Your Honor, I . . . It doesn't give them, it doesn't give the jury the choice to decide whether performance was excused. Right. Because there is a separate instruction that says the court has already determined that the foundation breached.  And then it says foundation claims that the other side breached and that if you so find, there will be an offset against the $3 million. That's correct. That's how it was presented to the jury. It was actually given for the benefit of foundation in this case because the jury already knew that they had breached. But on the topic of substantial performance and what the North Dakota law says, you know, it really couldn't be in dispute and they didn't request a substantial performance specifically jury instruction. They had these dealerships and operated them for over five years by the time of this jury trial. Had made tremendous profit each year, each year in excess of the earn out threshold. They had all the employees that Mr. Cooper had when he owned the dealerships. They all came over. They had a growing concern. This was a business that was going for five years and to suggest there was inadequate inventory was simply not correct. And you know, the jury also heard, and this is that app 1637, which is the first amendment to the APA that they had indicated back in May, May 1st of 2019 prior to the closing. Here's what foundation said in the first amendment to the APA. Diligence period. The parties acknowledge and agree that the diligence period has expired and buyer is satisfied with the results of its diligence review as of the date hereof. And the reason that was put in there is because the letter of intent was signed in August of 2018. So approximately nine months earlier, a very long time period for due diligence. And they agreed it was expired, but yet now they claimed in the lawsuit that the inventory wasn't there. The evidence in the case was on the date of the closing, June 21, 2019, that inventory was counted, including by a representative of foundation's bank. And they only paid for the vehicles they received. Nothing more. Their theory on inventory was hotly contested. And then following the sale, within three months, the owner-operator from foundation, Mr. Kramer, reduced the budget, that's at App 726, by $3 million, from $17 million down to $14 million on an available budget to buy new and used vehicles. And he did that when there was a GM strike, when there were no vehicles being produced. So to argue they were short on inventory at the time of the closing, respectfully, really wasn't a viable claim in this case. And then they said the vehicle counts were off on the dealer financial statements. There was significant testimony that the dealer financial statements, what you look at is the dollar amounts that are auto-filled by the manufacturer and the new vehicle schedules, which is a separate report provided by the manufacturer to get the accurate information on this Subaru issue and this Knudsen. There was testimony by Mr. Kuchenski, the CEO of foundation, who testified at a 30B6 deposition for foundation, that foundation was not making any claim in this lawsuit against Babco Cooper in relation to reduced Subaru inventory. He also testified that there was no evidence foundation was aware of that Mr. Cooper caused any reduced inventory. And then they presented no evidence whatsoever on reduced Subaru inventory at the trial or even how Subaru inventory was acquired, a process that car dealerships or manufacturers call consensus. But yet, as a surprise, on the fourth day of trial, through their expert, they came up with a new proposed demonstrative, which showed Subaru losses in it for the first time. And Judge Traynor asked her out of the hearing of the jury, can you say, when did you provide that to Mr. Bakke? Because we've heard testimony they're not making a claim on lost Subaru inventory. There's been no testimony Mr. Cooper caused it. You know, when did you come up with this? And she admitted it was several months prior to the trial, but yet they waited until the fourth day of the jury trial to try to spring that. Is that on your objection then? It was. Yeah, absolutely, because they handed it to me right before the start of the fourth day of the trial and I'm looking at it going, this can't be. So yes, we had a significant discussion outside of the hearing. I mean, essentially, what they're complaining about is the trial judge performing the trial judge duties. He never said anything, Judge Traynor, in front of the jury that was prejudicial in any way. In relation to questions he asked, I could be wrong, but it is my memory, and this trial was back in October, November of 24, so there's been a fair amount of water over the bridge since then. But my recall is he might have asked Mr. Cooper a question or two, but there were very few questions by the judge and very respectful. And so he was essentially performing the duties of trial judge to suggest that it was improper for him not to allow Ms. Knutson to testify about Subaru damages when she admitted, both twice in her discovery depositions as an expert, because we had two cases that got consolidated, she admitted that there was no way for her to segregate out Subaru damages. And so the judge logically indicated that if you can't segregate out the Subaru damages from the Chevrolet damages that are being discussed, how can the jury possibly sort this out? Because there's been no testimony of lost Subaru inventory. The Subaru practice was very different than the GM inventory practice in the respect that Mr. Cooper testified about this, that with Subaru, you get what you get. They're a small vehicle manufacturer. They don't make a lot of vehicles. They're in high demand, and therefore, as a dealership, you get what you get. You don't have any influence on accepting less or asking for more. You get what you get. And under that scenario, Mr. Cooper cannot affect Subaru inventory in any way, nor can any other Subaru dealer. And in relation to the $17 million that Judge Kobes asked about, that $17 million was just for goodwill. That was not the whole dealership. The inventory was separate. As I mentioned, bank comes in on the day of the closing, and they just pay for the vehicles that are present, new vehicles, used vehicle. They count everyone. They verify the price that's being paid for everyone. That's a separate payment. That's part of what dealerships call their floor plan. In relation to the goodwill, that was the $17 million. And Judge Treanor allowed Ms. Knutson to testify in relation to goodwill that they had supposedly overpaid on goodwill. But goodwill was defined in the letter of intent. And that is app 136 and app, I'm sorry, app 1679 and 1680. And goodwill is defined as an intangible asset, not a tangible asset. So tangible assets, of course, are ones you can touch, you can feel, you can see. Intangible assets are ones that are not subject to a quick and easy valuation. Goodwill, the $17 million, was identified as an intangible asset. Ms. Knutson, their expert, testified it was a tangible asset. And following that, calculated a loss of goodwill on what they supposedly overpaid. As part of her computation, she assumed that a new vehicle could be sold by the dealership 4.62 times when it can only be sold once.  I'm afraid your time has expired. Okay. Thank you, Your Honor. Thank you for your argument. Mr. Schaffer, we'll hear rebuttal. Your Honor, I want to start with the benign comments that Mr. Bakke just described from Judge Traynor. I'm looking directly at the trial transcript where he asked, where he was questioning Mr. Slemko. No, no, no. You. What did you know? Answer my question. And the witness says, I don't know. And so members of the jury, they did not know whether or not they could access this information. You ought to put it out of your mind, his testimony, that he could not access the information because he didn't know it at the time. You may perceive, Mr. Schaffer, Mr. Slemko, answer the questions when you're asked. And then later on, with Ms. Knutson, Judge Traynor was affirmatively trying to direct and develop testimony with the witness. He brought us the sidebar and says, I want this question to be asked, and when it's asked, I want her to say this specific answer. So it wasn't just benign questioning. It is on core issues and a core witness with respect to our case that Judge Traynor was directing that on. With respect to summary judgment, one of the aspects of prejudice was that the trial court permitted Mr. Bakke, opening statement, closing statement, and then included it on the verdict form that we were in breach and already down $3.3 million, communicating to the jury that, you know, I was taught in law school that breach is bad. So you're effectively communicating that directly to the jury, which I think is a prejudicial point. Well, it's prejudicial, but if it's accurate, why is there error? I mean, if you had breached by not making the payouts. The error is that it paints our clients in just a bad way, that they're the badly acting party before anything has really been decided. That would be an issue that things would be dealt with separately. Also, the final point on summary judgment is, elementally, they didn't prove it. They didn't prove who owed the obligation to make the earn-out payment. It was just joint and several liability without actually presenting in the briefs who owed the payment. All right. Thank you, Your Honor. Thank you for your argument. Thank you to both counsel. The case is submitted. The court will file a decision in due course. Counsel are excused.